IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **EBONI Z. POUNCY,** | No. 4:25-cv-02556 |
| Plaintiff, | District Judge: KENNETH M. HOYT<br>Magistrate Judge: |
| v. | CIVIL ACTION - LAW |
| **CHRISTINA E. RAY,**<br>**LESLIE E. TOVAR,**<br>**EDUARDO GONZALEZ, and**<br>**HARRIS COUNTY, TEXAS,** | JURY TRIAL DEMANDED |
| Defendants. | |

**FIRST AMENDED COMPLAINT WITH JURY DEMAND**

**AND NOW** comes the Plaintiff, EBONI Z. POUNCY, by and through her counsel, DEVON M. JACOB, ESQUIRE, of the law firm of JACOB LITIGATION, INC.; and BENJAMIN L. CRUMP, ESQUIRE, of BEN CRUMP LAW, PLLC; to aver the following:

**I.   JURISDICTION AND VENUE**

1. This action is brought pursuant to 42 U.S.C. § 1983.

2. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343.

3. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because the Defendants are located within the Southern District of Texas, and the cause of action arose in Houston, Harris County, Texas.

**II.   IDENTIFICATION OF PARTIES**

4. Plaintiff, EBONI Z. POUNCY ("POUNCY"), is an adult female, who during all relevant times, was a resident of Harris County, Texas.

5. Defendant, CHRISTINA E. RAY ("RAY"), is an adult female, who during all relevant times, was employed by the Harris County Sheriff's Office, as a sworn law enforcement officer with the rank of Sheriff Deputy. All of RAY'S actions were taken under color of state law. RAY is sued in her individual capacity.

6. Defendant, LESLIE E. TOVAR ("TOVAR"), is an adult female, who during all relevant times, was employed by the Harris County Sheriff's Office, as a sworn law enforcement officer with the rank of Sheriff Deputy. All of TOVAR'S actions were taken under color of state law. TOVAR is sued in her individual capacity.

7. Defendant, EDUARDO "ED" GONZALEZ ("SHERIFF"), is an adult male, who during all relevant times, was employed by the Harris County Sheriff's Office, as a sworn law enforcement officer with the rank of Sheriff. SHERIFF has shared final policymaking authority with Harris County, Texas, for the Harris County Sheriff's Office. All of SHERIFF'S actions were taken under color of state law. SHERIFF is sued in his official capacity.

8. Defendant, HARRIS COUNTY, TEXAS ("COUNTY"), owns and operates the Harris County Sheriff's Office ("HCSO"). COUNTY, through the Harris County Commissioners Court, has shared final policymaking authority with SHERIFF for the Harris County Sheriff's Office. The COUNTY'S principal place of business is 1001 Preston Street, Houston, Texas 77002. The HCSO'S principal place of business is 1200 Baker Street, Houston, Texas, 77002.

III. **MATERIAL FACTS**

9. HARRIS COUNTY, TEXAS ("COUNTY") owns and operates the Harris County Sheriff's Office ("HCSO").

10. EDUARDO "ED" GONZALEZ ("SHERIFF") is the elected Sheriff of Harris County.

11. Under Texas law, the Sheriff is a constitutional officer (Tex. Const. art. 5, § 23).

12. SHERIFF has shared final policymaking authority with COUNTY for the HCSO.

13. The HCSO is the largest sheriff's office in Texas, and the third-largest nationwide.

14. The HCSO employs over 5,000 people and provides law enforcement services to 4.5 million residents living within the 1,700 square miles of COUNTY.

15. On February 3, 2024, CHRISTINA E. RAY ("RAY") and LESLIE E. TOVAR ("TOVAR") were employed by the HCSO and COUNTY, as sworn law enforcement officers, each with the rank of Sheriff Deputy.

### A. RAY and TOVAR Use Deadly Force Against EBONI POUNCY

16. On Friday, February 2, 2024, EBONI Z. POUNCY ("POUNCY") and a friend ate dinner at a restaurant in Katy, Texas, before going to the friend's apartment, located approximately 35 minutes away.

17. On Saturday, February 3, 2024, at around 1:30 AM, they arrived at the friend's apartment – Pines of Woodforest, Apartment 2002, 90 Uvalde Road, Houston, Harris County, Texas 77015.

18. Apartment 2002 is a second-floor apartment accessible directly from the outside.

19. To reach the apartment, you need to go up two flights of stairs with a landing in the middle.

20. The top of the stairs connects with the right side of a small porch.

21. To get to the front door of the apartment, you need to walk to the opposite end of the porch, past two mulled double-hung windows.

22. The windows are large, with the top and bottom of the windows approximately one foot from the ceiling and floor.

3

23. The front door to the apartment does not have windows.

24. When POUNCY and her friend reached the front door, they discovered that the friend had left her key to the apartment at the restaurant in Katy.

25. It was chilly and windy outside.

26. It had been a long day, they were tired, and they wanted to get inside the apartment to go to sleep.

27. Previously, POUNCY'S friend had paid $60 for maintenance for the apartment complex to replace a cracked windowpane.

28. Realizing that it would undoubtedly cost at least the same amount for a locksmith to respond after hours, POUNCY'S friend decided that she would rather pay $60 to replace a windowpane than wait outside indefinitely for a locksmith to respond.

29. So, POUNCY and her friend removed a screen from the window located nearest the front door and broke the lower windowpane to gain entry to the apartment.

30. Because it was nighttime and the window was broken, they left the lights in the apartment on and the blinds partially open.

31. Unbeknownst to POUNCY and her friend, a neighbor had reported to RAY and TOVAR that it appeared as if someone had broken into the apartment.

32. RAY and TOVAR went to the apartment to investigate.

33. RAY and TOVAR arrived at the apartment about an hour after POUNCY and her friend had gained entry to the apartment.

34. When RAY and TOVAR arrived, POUNCY and her friend were asleep in a rear bedroom with the bedroom door closed.

35. RAY climbed the stairs in front of TOVAR.

36. Both RAY and TOVAR advanced up the stairs to the apartment with their semiautomatic duty weapons pointed towards the apartment.

37. Both RAY and TOVAR walked to the front door.

38. RAY knocked on the front door and in a raised voice stated, "Sheriff's Office" one time.

39. RAY and TOVAR then retreated to positions of cover – RAY at the top of the stairs against the right-side wall to the porch to the right of the windows, and TOVAR partially down the stairs but above the landing.

40. At around 2:30 AM, POUNCY and her friend woke to a banging noise.

41. Neither of them, however, heard RAY say, "Sheriff's Office."

42. POUNCY went to investigate.

43. Since it was 2:30 AM and the front window was broken, for her personal safety, POUNCY brought her lawfully owned 9mm semiautomatic Smith and Wesson handgun with her.

44. POUNCY exercised safe and proper gun handling, holding the gun at her side and pointed at the floor.

45. As POUNCY walked towards the front door, POUNCY did not know that RAY and TOVAR were outside with their duty weapons trained on the apartment, because neither RAY nor TOVAR had continued to announce their presence and/or issued orders to anyone who might be inside the apartment to show themselves.

46. As POUNCY walked towards the front door, TOVAR stated quietly to RAY, "someone's coming."

47. A few seconds later TOVAR, and then immediately thereafter RAY, began shooting bullets through the front wall and window at POUNCY with the clear intention of causing POUNCY to suffer serious injury and/or death.

48. When TOVAR began shooting, RAY yelled "drop the gun" one time.

49. At no time, however, did RAY or TOVAR issue a warning to POUNCY that if she did not comply with the order to "drop the gun," they would use deadly force against her.

50. TOVAR fired all the bullets in her duty weapon.

51. It is believed that RAY also fired all the bullets in her duty weapon.[1]

52. After reloading, again without warning to POUNCY, TOVAR again began firing bullets through the front wall and window at POUNCY with the clear intention of causing POUNCY to suffer serious injury and/or death.[2]

53. TOVAR again fired all the bullets in her duty weapon.

54. It was feasible for RAY and TOVAR to provide POUNCY with a verbal warning that they would use deadly force against her if she did not comply with the order to "drop the gun," but they did not do so.

55. Notably, while they reloaded their duty weapons and before the start of the second round of shooting, both RAY and TOVAR were silent.

56. Prior to and while being shot, POUNCY never saw, heard, or spoke to RAY or TOVAR.

57. Prior to and while being shot, POUNCY never threatened or otherwise indicated that she was a threat to anyone.

---

[1] It is unclear from the presently available video whether RAY fired her last bullet before reloading.
[2] It is unclear from the presently available video whether RAY fired her duty weapon after reloading.

58. Prior to and while being shot, POUNCY never raised her handgun from its original position.

59. Prior to and while being shot, POUNCY never assumed a shooting stance.

60. Prior to and while being shot, neither RAY nor TOVAR had any information to determine one way or the other whether POUNCY was lawfully in the apartment.

61. Despite the absence of *any* credible or observable threat, or any information from which to conclude that POUNCY was unlawfully (as opposed to lawfully) in the apartment, RAY and TOVAR fired bullets into the apartment at POUNCY until both had emptied their magazines.

62. Despite the absence of *any* credible or observable threat, or any information from which to conclude that POUNCY was unlawfully (as opposed to lawfully) in the apartment, both RAY and TOVAR reloaded their duty weapons, and again without providing a verbal warning, TOVAR began firing bullets into the apartment at POUNCY.[3]

63. POUNCY is a black female.

64. RAY and TOVAR improperly permitted POUNCY'S race to factor into and negatively bias their use of force decision making.

65. RAY'S body camera video, **Exhibit 1**, is incorporated herein by reference.[4]

66. TOVAR'S body camera video, **Exhibit 2**, is incorporated herein by reference.[5]

### B. POUNCY Suffered Serious Injuries

67. As a result of being shot by RAY and TOVAR, POUNCY suffered serious injuries, some of which are permanent and disabling.

---

[3] It is unclear from the presently available video whether RAY fired her duty weapon after reloading.
[4] https://youtube.com/shorts/UzqGst63-cE
[5] https://youtube.com/shorts/rZQiTL_ofTI

68. POUNCY was transported by ambulance, by the North Channel Emergency Medical Services, to Lyndon B. Johnson Hospital, for necessary emergency medical care.

69. RAY and TOVAR intentionally shot POUNCY five times, causing the following injuries:

    a. Non-penetrating bullet graze wound to the left upper chest. This wound healed with treatment but scarring remains.

    b. Penetrating bullet wound to the upper left abdomen. This bullet remained lodged in her body for many weeks. The bullet was eventually removed from a location approximately 10 inches lower from the entry wound. Bullet fragments from this bullet remain in her body. This wound healed with treatment, but scarring remains.

    c. Penetrating bullet wound to the right outer thigh. This bullet travelled ¾ of the way through her leg and lodged itself in her leg. This bullet has not been removed due to the medical dangers associated with removing it. This bullet resulted in scarring.

    d. Penetrating bullet wound in her left leg, entering below the knee on the outside, and exiting on the inside of the left leg below the knee. This injury caused nerve damage and scarring.

    e. Penetrating bullet wound to the left outer foot near the small toe. This injury caused nerve damage, footdrop, and scarring.

70. After the shooting, POUNCY began to experience abdominal and chest pain for which she has received medical treatment.

71. POUNCY suffered serious mental health injuries for which she has received treatment in the form of both medication and therapy.

72. The bullets that RAY and TOVAR shot into POUNCY'S body caused nerve damage in numerous locations in her body, weakness and numbness in both legs, drop foot, impaired ambulation, peripheral neuropathy, and abdominal pains.

73. The bullets that RAY and TOVAR shot into POUNCY'S body caused permanent scarring.

74. The bullets that RAY and TOVAR shot into POUNCY'S body caused serious and disabling emotional injuries, including but not limited to PTSD; paranoia; stuck in the fight or flight mode; severe flashbacks; the constant smell of gun smoke; fear of law enforcement, loud noises and knocks at the door; feelings of self-doubt, unworthiness, and of being an outcast or freak show; distortion of reality in that POUNCY is unsure if she is alive or dead; social anxiety; an inability to trust people; a lack of ambition and hope; and self-neglect and depression.

75. The bullets that RAY and TOVAR shot into POUNCY'S body significantly interfered with her ability to personally care for and bond with her infant daughter.

### C. SHERIFF and/or COUNTY'S Policies, Practices, and Culture, Caused POUNCY'S Constitutional Injuries

76. RAY and TOVAR acted in the course and scope of their employment.

77. RAY and TOVAR acted in their capacities as sworn law enforcement officers, and thus, under color of state law.

78. RAY and TOVAR acted pursuant to the SHERIFF and COUNTY'S policies and procedures.

79. RAY and TOVAR acted pursuant to their understanding of the SHERIFF and/or COUNTY'S policies and procedures based on how the SHERIFF and COUNTY taught and supervised them.

80. RAY and TOVAR acted pursuant to the SHERIFF and COUNTY'S training.

81. RAY and TOVAR acted pursuant to their understanding of the SHERIFF and COUNTY'S training based on how SHERIFF and COUNTY taught and supervised them.

82. RAY and TOVAR acted in accordance with the culture in the HCSO set and permitted by the SHERIFF and COUNTY.

83. Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

    a. The SHERIFF and COUNTY maintained the following policy and training deficiencies that were the moving force that caused Plaintiff's constitutional injuries:

Failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the de-escalation of incidents.

Failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the use of deadly force.

Failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the removal of racial bias from use of force decisions.

Failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding assessing actual threats before using deadly force.

Failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the need to provide proper and adequate warnings when feasible before using deadly force.

Failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the rights of persons in Texas to possess firearms.

Adopted, implemented, and/or maintained, policies and/or training based on killology ideology where law enforcement officers are taught to consider every incident a deadly incident.

Adopted, implemented, and/or maintained, policies and/or training that encouraged deputies to use force with minimal oversight, creating a foreseeable risk of harm.

Adopted, implemented, and/or maintained, policies and/or training that failed to ensure compliance with policies or correct unlawful practices.

Adopted, implemented, and/or maintained, a policy where the HCSO deferred to the Harris County District Attorney's office the responsibility to investigate deputy involved shootings despite the scope of the District Attorney's office's investigation being limited to violations of criminal law.

Adopted, implemented, and/or maintained, a policy where the HCSO did not conduct a separate and independent investigation from the DA's Office's investigation to determine if HCSO policies and training were violated and/or deficient.

Adopted, implemented, and/or maintained, a policy where if no criminal indictment resulted, the HCSO would clear the deputy of wrongdoing.

b. SHERIFF and COUNTY knew that their law enforcement officers were routinely required to make use of force decisions.

c. SHERIFF and COUNTY knew that their law enforcement officers routinely made incorrect use of force decisions that resulted in violations of citizens' civil rights.

d. SHERIFF and COUNTY knew that their law enforcement officers were routinely required to evaluate facts to determine whether deadly force was necessary and lawful.

e. SHERIFF and COUNTY knew that their law enforcement officers routinely incorrectly identified persons as deadly threats, which resulted in violations of citizens' civil rights.

f. SHERIFF and COUNTY knew that their law enforcement officers were failing to provide warnings when feasible before using deadly force.

g. SHERIFF and COUNTY had access to body camera video, police reports, and use of force reports, that contain information evidencing the systemic failures, which provided them with actual or constructive notice of the failures.

h. Despite it being plainly obvious to SHERIFF and COUNTY as a result of direct observation, citizen complaints, and/or litigation, that additional or different policies and/or

11

training would protect the civil rights of citizens, SHERIFF and COUNTY acted with deliberate indifference by not providing the additional or different policies and/or training.

84. Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

    a. SHERIFF operates the jail.

    b. HCSO deputies work in the jail.

    c. HCSO deputies often move from the jail to patrol.

    d. Many of the HCSO systemic failures are shared between the jail and patrol.

    e. DOJ and internal investigations and prior litigation placed SHERIFF and COUNTY on notice of identified systemic failures that included a pattern of excessive force, inadequate supervision of deputies, and insufficient discipline.

    f. SHERIFF and COUNTY knew of the risks of unconstitutional force caused by these systemic failures yet failed to act sufficiently to resolve the issue.

85. Plaintiff's constitutional injuries were a foreseeable consequence of the systemic failures.

86. As a direct and proximate result of SHERIFF and COUNTY'S deliberate indifference, RAY and TOVAR used unlawful deadly force.

## IV.    LEGAL CLAIMS[6]

### COUNT I

**Plaintiff POUNCY v. Defendants RAY and TOVAR**
**Fourth Amendment (Excessive Force)**
**Pursuant to 42 U.S.C. § 1983**

87.    Paragraphs 1-86 are incorporated herein by reference.

88.    The right to be free from excessive force during a seizure is clearly established. Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012).

89.    42 U.S.C. § 1983 authorizes lawsuits against law enforcement officers who violate Federal constitutional rights while acting under color of state law.

90.    Claims that a law enforcement officer used excessive force in violation of the Fourth Amendment to the Federal Constitution are analyzed under an "objective reasonableness" standard. See Graham v. Connor, 490 U.S. 386, 388 (1989).

91.    To state a Fourth Amendment claim of excessive force, a Plaintiff must establish that (1) she was seized, (2) she suffered an injury (3) the injury resulted directly from a use of force, and (4) the force used was objectively unreasonable. Flores v. City of Palacios, 381 F.3d 391, 396 (5th Cir. 2004); Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir. 2005); Bush v. Strain, 513 F.3d 492, 500-01 (5th Cir. 2008).

92.    In the Fifth Circuit, the excessive force inquiry is limited in scope to whether the law enforcement officer or other persons were in danger at the moment when the force was used. See Harris v. Serpas, 745 F.3d 767, 772 (5th Cir. 2014).

---

[6] In a Complaint, a Plaintiff is only required to plead facts, not legal theories. See Johnson v. City of Shelby, 574 U.S. 10 (2014) (Per Curiam) (reversing Fifth Circuit and holding that only facts need to be pled in a complaint, not legal theories). Plaintiff is only required to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U. S. 544, 569-70 (2007); Ashcroft v. Iqbal, 556 U. S. 662 (2009). Plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P 8(a)(2). "Each allegation must be simple, concise, and direct. No technical form is required." FED.R.CIV.P. 8(d)(1).

93. RAY and TOVAR'S immediate resort to deadly force violated clearly established law.

94. RAY and TOVAR'S failure to provide warnings when feasible before using deadly force violated clearly established law.

95. RAY and TOVAR used physical force against POUNCY by firing bullets at her with the intent of causing serious injury or death.

96. The bullets fired by RAY and TOVAR entered POUNCY'S body causing life-threatening injuries.

97. When RAY and TOVAR used force against POUNCY, POUNCY did not present as a significant or deadly threat to anyone.

98. RAY and TOVAR improperly permitted POUNCY'S race to factor into and negatively bias their use of force decision making.

99. RAY and TOVAR used force that was not objectively reasonable.

100. The force used was excessive, unlawful, and used solely for the purpose of causing physical pain, injury, and/or death.

101. As a direct and proximate result of RAY and TOVAR'S conduct, POUNCY suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, and permanent and disabling injuries.

102. As a direct and proximate result of RAY and TOVAR'S conduct, POUNCY has and will incur attorneys' fees and litigation costs.

## COUNT II

### Plaintiff POUNCY v. Defendant COUNTY
### Fourth and Fourteenth Amendments—Monell Liability
### Pursuant to 42 U.S.C. § 1983

103. Paragraphs 1-86 are incorporated herein by reference.

104. "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

105. To establish a municipality's liability, the Plaintiff bears the burden of pleading and proving the existence of: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose moving force is the policy, practice, or custom. *See id.* at 691; *Bishop v. Arcuri,* 674 F.3d 456, 467 (5th Cir. 2012).

106. To establish the third element, the plaintiff must show either: "(1) the policy itself violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences[.]" *Johnson v. Deep East Tex. Regional Narcotics Trafficking Task Force,* 379 F.3d 293, 309 (5th Cir. 2004).

107. During all relevant times, RAY and TOVAR acted pursuant to the policies and procedures of COUNTY.

108. The identified policies of COUNTY were the moving force that caused POUNCY'S constitutional injuries.

109. As a direct and proximate result of the COUNTY'S conduct, POUNCY suffered

embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, and permanent and disabling injuries.

110. As a direct and proximate result of the COUNTY'S conduct, POUNCY has and will incur attorneys' fees and litigation costs.

## V. REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff POUNCY respectfully requests that judgment be entered in her favor as follows:

A. **Declaratory Judgment:** Providing that the Defendants' individual and collective conduct violated POUNCY'S federal rights;

B. **Compensatory Damages:** Including, but not limited to, the monetary value associated with the following: violations of legal rights, emotional distress, emotional injury, embarrassment, mental anguish, pain and suffering, physical injury, scarring, and permanent disability;

C. **Punitive damages** as permitted by law;

D. **Equitable Relief:** An admission of the allegations stated in the Complaint, in writing, and an oral and written apology for same, in person, from Defendants;

E. **Attorney's Fees and Costs**; and

F. **Discretionary Damages and Relief:** Such other financial or equitable relief that the Court deems reasonable and just.

## VI. JURY TRIAL DEMAND

POUNCY respectfully demands a trial by jury on all claims/issues in this matter that may be tried to a jury.

**Respectfully Submitted,**

| | |
|---|---|
| */s/Devon M. Jacob* | Date: August 14, 2025 |

**DEVON M. JACOB, ESQUIRE**
**Attorney in Charge**
PA Bar No. 89182
Fed. No. 3663337
**JACOB LITIGATION, INC.**
P.O. Box 837, Mechanicsburg, Pennsylvania 17055-0837
(717) 796-7733 | djacob@jacoblitigation.com

| | |
|---|---|
| */s/Aaron Dekle* | Date: August 14, 2025 |

**AARON DEKLE, ESQUIRE**
Tx Bar No. 24100961
Fed No. 3510570
**BEN CRUMP LAW, PLLC**
5 Cowboys Way, Suite 300, Frisco, Texas 75034
(972) 942-0494 | aaron@bencrump.com

**BENJAMIN L. CRUMP, ESQUIRE**
FL Bar No. 72583
*Pro Hac Vice*
**BEN CRUMP LAW, PLLC**
122 South Calhoun Street, Tallahassee, Florida 32301
(800) 235-0444 | court@bencrump.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| **EBONI Z. POUNCY,** | No. 4:25−cv−02556 |
| Plaintiff, | District Judge: Kenneth M. Hoyt |
| v. | Magistrate Judge: |
| **CHRISTINA E. RAY, et al.,** | CIVIL ACTION - LAW |
| Defendants. | JURY TRIAL DEMANDED |

## Certificate of Service

I, Devon M. Jacob, Esquire, hereby certify that on the below referenced date, I caused a true and correct copy of this First Amended Complaint to be served, via ECF, on any counsel of record.

**Respectfully Submitted,**

/s/*Devon M. Jacob*                              Date: August 14, 2025
**DEVON M. JACOB, ESQUIRE**